

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00160-CR

**ARACELI TELLO,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 272nd District Court
Brazos County, Texas
Trial Court No. 12-02891-CRF-272**

## MEMORANDUM OPINION

A jury found Appellant Araceli Tello guilty of aggravated robbery, and the trial court assessed her punishment, enhanced by prior felony convictions, at thirty-five years' imprisonment. This appeal ensued.

The relevant facts are as follows: Leobardo Flores, the alleged victim, testified that he and his wife were together as a couple at the time of trial but that in May 2012, he "thought to cheat on her" because she had cheated on him. On May 4, he received several phone calls from Tello, whom he had known for about fifteen or twenty days as

a prostitute named Juanita. He agreed to meet up with Tello so that he could get together with Tello's friend. When he arrived at the store where they were supposed to meet, Tello came to his car and got inside. He asked where her friend was, and Tello told him that she had gone to take her child to the babysitter but that she would come and get together with them. He then asked Tello where to go, and she directed him to a place by the railroad tracks to wait.

Flores stated that he had a feeling that something was wrong. A car approached and parked behind them. He told Tello that it was not her friend, but Tello assured him that it was. He started the car and tried to pull away, but Tello told him to wait. A man then approached Tello's window, which was open, and pointed a gun at Flores. The man told him to give him his wallet and phone, which he did. He had gotten paid that day and had about $1,000 in his wallet. The man told him not to call the police or he would kill him. Tello left with the man. Flores then went back to the store where he had met Tello and called the police.

During cross-examination, Tello's counsel asked Flores what the name of his wife is. The State made a relevance objection that the trial court overruled. The following exchange then occurred outside the presence of the jury:

> [Prosecutor]: … So, I think he is uncomfortable giving the name of one of his loved ones in fear of retaliation.

> [Defense Counsel]: … But she could be a very key witness as to what he might have told her about this situation. So for that reason -- I mean, I don't know who she is. I might need to subpoena her.

> THE COURT: You want to subpoena her up here?

[Defense Counsel]: Well, I'll have to see how his testimony goes.

THE COURT: What has been said about her to this point?

[Defense Counsel]: Nothing.

THE COURT: Yeah, she's been brought up.

[Defense Counsel]: Well, she's been brought up that he's married.

THE COURT: And I think somebody said that he almost broke up with her --

[Defense Counsel]: That she was cheating.

THE COURT: She was cheating; so, he decided to cheat on her; and now, he's gone back with her.

[Prosecutor]: And I don't care if he wants to get into the relationship or what -- anything like that. It's just I think he's concerned about giving up a family member's name.

THE COURT: So, do you think he might have talked to her?

[Defense Counsel]: Well, Judge, that seems logical that they would discuss this. And this deal about her cheating on him is the reason for their broken up, that's the first time I've ever heard that.

THE COURT: I'm just trying to think through it all. So, if he gives you the name, you're going to subpoena her up here, right?

[Defense Counsel]: I'm going to have to ask the address after that, but I can do that off the record, I guess. I mean, there's a good possibility.

….

[Defense Counsel]: I understand all that. But, I mean, getting ahold of a witness. That deal when he said something about, "Well, she had cheated on me," I had never heard that before. Never heard that.

[Prosecutor]: Well, the thing about cheating went to his motive to engage in prostitution. It has nothing to do with the robbery, other than that's how he came to be there that night.

[Defense Counsel]: It potentially could.

[Prosecutor]: But, I mean, we're talking about a witness that has absolutely no personal knowledge about the facts of what happened. The only potential knowledge she could have is, you know, if he relayed to her what happened. But he's talked to -- now, we've already got in what he told the 9-1-1 operator, what he told the detective. We're going to play the recording of what he told the detective. He talked to two more detectives at a later date; and now, he's testified here in court; and, you know, we're going to go fishing for -- he's always told the same story but maybe he told his wife something different on ….

….

[Prosecutor]: I guess, the basis of our objection, Judge, the test under 401 is does the evidence -- does the question that's on the table have a tendency to make the existence of a fact of consequence in the case more or less likely. And applying that standard, which is the 401 standard, to what's your wife's name, I don't see where that makes any fact of consequence in this aggravated robbery prosecution of this Defendant more or less likely.

….

THE COURT: What can you articulate for the record as to why you need this name?

[Defense Counsel]: Well, Judge, I mean, it has been mentioned by the State and brought forth the fact that he has -- in the initial tapes of [Detective] Fleming and during their conversation, Fleming testified, about his being married and in the process of divorce, not wanting her to find out about this -- I'm trying to recall everything he said to Fleming.

At that point, there was also testimony brought through Mr. Flores by [Prosecutor] as to she had cheated on him. He had cheated on her now, doing this cheat on her, that they're back together and these kind of things.

And, Judge, the part about her cheating on him, I had never heard that. It's not in any other statements, anything like that. I want to potentially talk to her at least -- be able to talk to her and --

THE COURT: Do you have any other way of finding her and talking to her?

[Defense Counsel]: No, sir. I mean, I don't know her name. I think everything I received from the State did not have an address for him.

THE COURT: So, you don't know where he's living?

[Defense Counsel]: No, sir, never have. If they want to bring her up here, I don't have to serve her or whatever; and I can sit down and talk to her. That's fine.

[Prosecutor]: May I respond to his argument?

THE COURT: Yes, sir.

[Prosecutor]: We're talking about a completely collateral issue that has nothing to do with this case, other than that was why he was looking to get with a prostitute, was because of the situation with his wife. But as far as the offense that's alleged, whether -- what he's wanting to go into is whether or not, in fact, his wife cheated on him. That is -- I mean, that's what you've said several times now. That issue is completely collateral to this case.

And so, that would be my response as to our relevance objection, is you're talking about testimony on an issue that is completely collateral to and has no bearing on the facts of this case.

The only other way that -- kind of getting to what he was taking [*sic*] about earlier, that the wife could even potentially play a role in this, is if there were any kind of prior inconsistent statements. But in order to get in anything that he told her about this offense as a prior inconsistent statement, two things have to happen. He first has to give the witness an opportunity to explain or deny making that statement before we can bring in the wife and have extrinsic evidence of it. No such impeachment has happened, nor will there be any because there's no evidence whatsoever that any such prior inconsistent statement was made.

And the prior inconsistent statement rules are not a license -- are not a fishing license. You cannot go, "Well, I now want -- I now, in

trial, want the information, the names and addresses of every person that you may have ever talked to ever to see if there is a prior inconsistent statement." That's not what that's for.

And so, absent any evidence that he ever made any prior inconsistent statements and absent any questions to the witness offering him an opportunity to explain or deny any prior inconsistent statements, it didn't come in there either.

And so, now, we're back to the relevance issue; and that's the basis of our objection.

....

[Defense Counsel]: Up to this point, you've listened to Fleming's tape as well as their testimony. He says that he's going through a divorce, but he's trying to fix it. And, I mean, I think --

THE COURT: He's going through a divorce and trying to fix it?

[Defense Counsel]: He's told Fleming they're trying -- he's trying to fix it, trying to get back with her when this happens.

THE COURT: Okay.

[Defense Counsel]: All right. My deal basically is there's some talk about this cash, large amount of cash. He's got that. He loses his cash somehow that night, be it paying prostitutes or somebody steals it, don't know. But then, you know, it's something to it. Like I was getting at before, if you sit there and say, "Look, I couldn't perform or whatever. I lost my money," the cop's not going to get it back for you.

If you say, "Somebody stole it from me," he's going to get it back for you. And explaining to the wife as to why I don't have this money, and that's -- I want to see what this discussion goes on with her.

....

THE COURT: So, he's trying to make himself look better by saying "she's cheating on me;" so, you could interrogate her and find out, you know, if that's true or not. Bring her up to say, "No, I wasn't cheating on him. He's lying about that." But as the Prosecutor said, that appears to be a collateral matter and you're not entitled to impeach on a collateral matter.

So, what is your response to that argument, impeachment on a collateral matter?

[Defense Counsel]: I mean, as to that, that's not my main concern or what I tried to do. I want to get to what -- how did he explain this to his wife. Because there is -- I mean, defensive theory that he called the cops and yelled robbery because he wanted his money back.

….

THE COURT: Has anyone on the behalf of the State, to your knowledge, received any inkling of information about what this wife might say that could be considered exculpatory by any argument?

[Prosecutor]: No, sir. We have never spoken to her. I don't believe that law enforcement ever spoke to her. Our investigator has not spoken to her. Our victim coordinator has not spoken to her. She -- from the State's perspective, law enforcement perspective, the wife has absolutely no role in this investigation or in this case whatsoever.

….

THE COURT: I'm going to interview the witness in-camera, and I'm going to take a list of questions from you. And it will be on the record, sealed in the record; and I'm going to find out what you want to know without you knowing who she is or her address or phone number. If she has exculpatory information, I'm going to grant your request to talk to her.

….

THE COURT: So, for now, I'm denying -- I'm taking your request under advisement until I interview the witness. So, right now, you can't ask what her name is.

[Defense Counsel]: Or address or --

THE COURT: Not yet.

[Defense Counsel]: But I can ask as to what he told his wife about this and all.

THE COURT: Yeah, you can ask him that.

Tello's counsel then continued his cross-examination of Flores, which included the following exchange:

> Q.    [(By Defense Counsel] And you're still living with your wife at this time, correct?
>
> A.    That is right.
>
> Q.    Okay.  Did you tell your wife you were going to do something else or going to be -- you wouldn't be home for awhile?
>
> A.    That's right.
>
> ….
>
> Q.    Okay.  And you had told your wife that you had -- you were just going to leave your home and go step out some[ ]place for awhile, correct?
>
> A.    No.
>
> Q.    What did you -- I think you testified earlier that's what you did.  You left your home?
>
> A.    No.
>
> Q.    Okay.
>
> A.    No.
>
> Q.    Okay.  So, where were you coming from?
>
> THE INTERPRETER:  I'm sorry?
>
> [Defense Counsel]:  Where were you coming from?
>
> THE WITNESS:  From having my hair done -- cut.
>
> Q.    (By [Defense Counsel]) And so, had you told your wife your whereabouts, where you were going to be at that time?

A.     Regularly, I come out from work.  I come out late from work.  When I call my wife that I was going to come back late from work, but not too late.

Q.     Okay.  So, you're telling her that you're still at work?

A.     That's right.

Q.     You don't recall earlier in your testimony where you told me that you told her you just had to go run an errand basically?

A.     No.

Q.     Okay.  So, she thinks you're still at work; and you're out trying to meet this prostitute?

A.     That's right.

Q.     Okay.  And, I mean, she knows -- your wife knows you got paid that day, on Friday?

A.     That's right.

....

Q.     No, I guess my question is:  Did you tell your wife -- yes or no -- tell her about you getting robbed?

A.     No.

Q.     She knows nothing of this?

A.     After the time she began getting to know it.

Q.     So, how -- did you tell her about it; or did somebody else tell her about it?

A.     The letters that I received at home, they say that I was involved in a robbery; so, she started asking me questions about what happened that day.

Q.     Okay.  And you told her that someone held you up at gunpoint?

A.    No.

Q.    Okay.  You told her that you were there waiting to meet a prostitute?

A.    No.

Q.    Okay.  But she has asked you on other occasions about what these letters are and all that, correct?

A.    That's right.

….

Q.    Okay.  Okay.  … I'm going to ask you this question:  You stated that you had not told your wife about what happened, the facts of this case, correct, the facts of this case?

A.    Correct, not the details.

Q.    She came to you and said, "What are these letters about you being robbed," correct?

A.    That's right.

Q.    What did you tell her?

A.    I told her a story.

Q.    Well, tell us what story you told her.

A.    Yes, I tried to get away from telling her that I was going to go meet with a prostitute.

Q.    What story did you tell her?

A.    I told her that since I had been robbed earlier or before I was working with the police officer to try to catch the people that had robbed me.

Q.    So, you had been robbed before this?

A.      That's right.

….

Q.      You said you were working with the police to -- based on an incident that happened before this, right?  Is that what you told us?

A.      That's right.

Q.      So, you told her that this was about the cell phone?

A.      That's right.

Q.      And that's all you have ever told her about this case is that this case -- the reason why you're getting the letters is because of this about the cell phone that was stolen from you prior to this incident?

A.      No.

Q.      Okay.  What else have you told her?

A.      She found -- she found out about what had happened on Facebook.

Q.      On Facebook?

A.      That's right.

Q.      Someone put on Facebook about this incident?  Are you talking about like a newspaper article she read?

A.      That's right.  His picture was there; and so, that's the reason why she knows that he goes to the store where she works.

Q.      No, my question is this:  I mean, did you describe to her any of the events of that night?

A.      In time she started learning about it, and I had to start telling her.

Q.      So, yes, you have told her details of events of that night?

A.      She asked me, and I look at her --

THE INTERPRETER:  Oh, correction.  She asked me, and I deny it.

Q.     (By [Defense Counsel]) … [T]his is a simple question.  Have you at any point in time discussed with your wife the incident and the details of the incident?

A.     No.

Q.     And when she finds it on the newspaper article about it and confronts you about it, you told her that's a lie?

A.     That's right.

Q.     What part?  I mean, that it was a lie that it's in the newspaper or a lie that you were robbed; or what part did you tell her was a lie?

A.     That I was going to go meet with two prostitutes.

Q.     You just -- you deny that part to her, and you said that part's a lie?  That's the only part that's a lie?

A.     That's right.

Q.     But if I recall that newspaper article, it described you as being in the vehicle with another woman, correct?

A.     I didn't read the newspaper article.  My wife explained that to me, and I believe so.

Q.     All right.  So, you have denied that you were anywhere around that -- that part of this story that has been in the newspaper, you told your wife -- denied the fact that you were around any women that night?

A.     That's right.

Q.     So, you told your wife it's a lie when it comes to the fact that there's women involved in this case?

A.     That's right.

At the conclusion of Flores's testimony, Tello's counsel again brought up questioning Flores's wife, and the State re-urged its relevance complaint. At that point, the trial court informed the parties that it planned to proceed with the in-camera hearing and adjourned for the day.

The next morning, the State objected to any further questions by anybody regarding what communication was made between Flores and his wife, arguing that such communication was protected by the marital-communications privilege. The trial court sustained the State's objection. The trial court then told defense counsel to put his objection on the record, which he did as follows:

> [Defense Counsel]: Well, I mean, as to this case, just for the purpose of the record, that the victim -- alleged victim has testified that he at first did not tell his wife about this occurrence. Then, when some paperwork came from the D.A.'s office and she questioned him about that, he told her something, which I kind of followed yesterday about some cell phone that was stolen by somebody else prior to that. Then she confronted him with a newspaper article, which according to him, it was a Facebook or newspaper article that described this incident.
>
> ….
>
> [Defense Counsel]: Per the Court's ruling yesterday that was going to allow the in-camera questioning of her, I was asked to submit some -- the questions that I wanted, which --
>
> THE COURT: I've changed my mind. I'm not going to do that.
>
> [Defense Counsel]: I understand that; but for purposes of the record, I'm going to read them into it.
>
> THE COURT: Yes, sir. Go right ahead.

[Defense Counsel]: I sent an e-mail to the Court as well as [Prosecutors] at --

THE COURT: Why don't you just introduce a copy of them, and that will be marked Court's Exhibit Number 1 for purposes of appeal, copies of your --

[Defense Counsel]: My problem is there's not an attachment of the newspaper article on this that I sent the Court. I'll have to read that into the record.

THE COURT: You can read that.

[Defense Counsel]: But he testified up here on the stand that he was -- she confronted him about some newspaper article, which I searched and searched; and the only one I could find does not have his name on it. So, I don't know how she ever came to that conclusion that was him.

But he stated that at that point that -- mentioned about prostitutes and stuff, he said -- told her it was a lie.

And I had him -- of course, I don't know what newspaper article she's referring to because I can't ask her what article it was. I don't know what part he's saying is a lie and not a lie.

And, Judge, I mean, as to his credibility, as to basically his word stating that this happened, he is flimflamming around up here about what he told his wife about it, trying to explain it. I think that he has waived his -- any kind of marital privilege that the State asserts he has by making the statement.

The State did not object to it. It's not the Court's duty to object to it. It's the State's. They're the ones -- I mean, same as, you know, if I allowed hearsay in, I mean, by some witness that's not my client. Well, it's not the Court's duty to say, 'Well, you can't say that because it's hearsay."

I think this is a violation of my Defendant's right to due process and compulsory process. The witness -- as outlined in *Coleman*, 966 S.W.2d, the Defendant's entitled to the Sixth Amendment to present a defense, the right to present the Defendant's version of the facts and as well as the Prosecutor has that right so the jury may decide where the truth lies.

And if the Defendant can make a plausible showing to the trial court, even though if he's not had the opportunity to interview the witness, which I have not. I'm being denied that because I can't get a telephone number, location, anything.

You know, I'm going to establish matters that that witness might testify to. She might testify that he told me it was all a farce. He told me, "Nothing ever happened," which obviously would be -- hold great weight with the jury.

He might have told her, "Well, yeah, I did. I was unfaithful. I was -- you know, I had consensual sex with these people. They didn't rob me." I don't know what he's going to say.

But I, also, on one thing, the spousal communication protects communications, if it does apply in this situation. It doesn't protect acts. And as to her testifying if she was unfaithful to him, that's not a communication. That's an act.

And his testimony up here was the first time I heard it, that, "Well, I was dealing with her being unfaithful to me." It sheds a light on him that it's okay what he's doing; and I think that that has -- the Defendant has a right to go into that; and the Court is denying me that as well.

And so, under due process, Sixth Amendment, as well as I believe the Court is wrong as to Rule 505 [*sic*]. I believe the State has waived that and this case -- the *Bruni* case that I presented to the Court clearly states that that's not something you can go back and later claim after the testimony has been out there.

THE COURT: All right. That will be your objection for the record.

[Defense Counsel]: And I need to read in the article.

THE COURT: All right.

….

[Defense Counsel]: ….
The attachment which I need -- I'll put the e-mail in here. The attachment to the e-mail -- there was two attachments. One of them being an article from "The Eagle" on May 18th, 2012, entitled "Man Duped by Prostitute and her Friend Report States."

It says: Bryan man recently told police that he wondered if he was set up by a possible prostitute trying to find him a, quote, unquote, date led him to a parking lot where he was robbed at gunpoint. The incident happened just before 9:00 p.m., May 4th, in the 2900 block of West 28th Street, when the man said he made a deal with the woman after rejecting her offer for services, the court document states. She climbed into his car and told him she could set him up with another woman, but

once a few blocks away, all the driver saw was a car with another man approaching, the document states.

"Later the driver told police that he thought something was strange, but it wasn't until he was waiting for the police that it occurred to him that he was likely setup. The woman, who twice put the car in park when the driver tried to leave the lot, rolled down her window as the second man approached and ordered the driver to give his wallet with $1,000 in it and his cell phone, the police report states.

"The driver complied and the man, along with the prostitute, jumped into the car and sped away, the police said. The victim quickly called police from a nearby store.

"It was at the convenience store that detectives reviewed surveillance video and through a brief investigation learned the identity of the woman and the man. Warrants were issued for the arrest of Robert Guzman Sierra, 26, and Araceli Tello, 36. Both were taken into custody Wednesday on charges of aggravated robbery which is a first degree felony."

Which as that article -- there's a lack of any Leobardo Flores, even though Mr. Flores said that that was -- his wife confronted him about an article, and my understanding was he said a newspaper article, so --

THE COURT: All right. Are you going to introduce a copy of your questions?

[Defense Counsel]: Yes, sir.

THE COURT: And that will be marked Court's Exhibit 1 for purposes of appeal.

**(Court's Exhibit No. 1 offered and admitted.)**

Court's Exhibit No. 1 provided the following questions to be propounded to Flores's wife:

1. Do you recall ever receiving in the mail any documents in which your husband was referenced as being an alleged victim of Aggravated Robbery?

a) If so, **when** do you recall receiving such documents in the mail?

b) If so, did you at anytime question your husband as to why he was receiving such documents in the mail?

c) If so, what was your husband's response?

2. Have you at anytime read a newspaper article, Facebook post, etc. that you believe described an incident in which your husband was the alleged victim of Aggravated Robbery?

a) If so, **when** do you recall reading this newspaper article, Facebook post, etc.?

b) If so, did this newspaper article, Facebook post, etc. specifically identify your husband by name as being an alleged victim of Aggravated Robbery?

c) If so, was what you read the same or similar to the article that was published on May 18, 2012 in the Bryan/College Station Eagle Newspaper? **See** *"Police: Man Likely Duped By Prostitute"* attached hereto.

d) If so, did you at anytime confront your husband concerning the information you had read in this newspaper article, Facebook post, etc.?

e) If so, what was his response to your questioning of him about the information you had read in this newspaper article, Facebook post, etc.[?]

d) [*sic*] In responding, did your husband specifically deny having contact with any female (prostitute or otherwise), as described in the newspaper article, Facebook post you read?

e) [*sic*] In responding, what amount of money did your husband claim was stolen from him?

3. Prior to May 4, 2012, had your husband ever accused you/discussed with you allegations that you had been unfaithful to him?

In her first issue, Tello contends that the trial court erred in ruling that she could not question Flores's wife as to what communications he had with his wife regarding the facts surrounding the alleged aggravated robbery. Tello argues that Flores waived any possible privilege that he held regarding these communications when he testified about what communications he had with his wife regarding the facts surrounding the

alleged aggravated robbery without objecting that the communications were privileged.

Similarly, in her second issue, Tello contends that the trial court violated her Sixth

Amendment right by denying her the ability to obtain any identifying information of a

material witness (Flores's wife) in order to compel the witness's attendance to testify at

trial. Even if the trial court erred, however, Tello was not harmed by such error. *See*

TEX. R. APP. P. 44.2.

Based on Court's Exhibit No. 1, Tello first wanted to ask Flores's wife to what

extent she had confronted Flores about the alleged aggravated robbery and about what

he had told her in response. Before introducing Court's Exhibit No. 1, Tello explained:

> You know, I'm going to establish matters that that witness
> might testify to. She might testify that he told me it was all a farce. He
> told me, "Nothing ever happened," which obviously would be -- hold
> great weight with the jury.
> He might have told her, "Well, yeah, I did. I was unfaithful.
> I was -- you know, I had consensual sex with these people. They didn't
> rob me."

Any testimony by Flores's wife about what Flores told her about the robbery would,

however, have been inadmissible hearsay. *See* TEX. R. EVID. 801, 802.

Furthermore, any testimony by Flores's wife about what Flores told her about the

alleged aggravated robbery would not have been admissible for impeachment purposes

as a prior inconsistent statement under Rule of Evidence 613(a). Rule 613(a) provides:

> In examining a witness concerning a prior inconsistent statement made by
> the witness, whether oral or written, and before further cross-examination
> concerning, or extrinsic evidence of, such statement may be allowed, the
> witness must be told the contents of such statement and the time and
> place and the person to whom it was made, and must be afforded an
> opportunity to explain or deny such statement…. If the witness

unequivocally admits having made such statement, extrinsic evidence of same shall not be admitted.

TEX. R. EVID. 613(a).  Here, Flores readily admitted that what he told his wife was inconsistent with his testimony of what happened during the alleged aggravated robbery.  Flores testified that he lied to his wife about the alleged aggravated robbery to hide the fact that he was soliciting a prostitute at the time he was robbed.

Finally, based on Court's Exhibit No. 1, Tello also wanted to ask Flores's wife if Flores had accused her or discussed with her allegations that she had been unfaithful to him.  But any testimony by Flores's wife about such communication would have been irrelevant.  *See* TEX. R. EVID. 401, 402.

Therefore, as stated above, even if the trial court erred, Tello was not harmed by such error.  *See* TEX. R. APP. P. 44.2.  Both of her issues are overruled, and the trial court's judgment is affirmed.


                                        REX D. DAVIS
                                        Justice


Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
        (Chief Justice Gray dissenting with a note)*
Affirmed
Opinion delivered and filed April 23, 2015
Do not publish
[CRPM]

*        (Chief Justice Gray dissents.  A separate opinion will not issue.  He notes however that this case turned on the credibility of Flores, the alleged victim.  While testifying on cross examination Flores admitted he had lied to his wife about the events

resulting in the defendant's arrest and trial.  The extent and scope of what Flores told his wife were restricted to what Flores was willing to admit.  The defendant was effectively asked to believe Flores about what lies Flores had told his wife and to believe what he was testifying to was the whole truth at trial including what he had previously lied about when telling his wife.  This calls to mind Professor Matt Dawson's (Baylor Law School's Practice Court Professor) famous cross examination question:  Were you lying then or are you lying now?  As argued by the defendant, for all we know Flores could have made up the story he was telling the police to continue to cover the lies he was telling his wife.  Without the ability of the defendant to interview and possibly subpoena Flores's wife, the defendant was denied the ability to effectively investigate and pursue a defense directly involving Flores's credibility about the events at issue.  What could be a more relevant source of material information to impeach the testimony of the State's star witness, the alleged victim, than the person to whom he told an entirely different story about the events.  The trial court erred in refusing to require disclosure of the identifying information for Flores's wife.)

